UNITED STATES of America,
Plaintiff-Appellee,

v.

James W. DeCASTRIS,
Defendant-Appellant.

No. 85–3135.

United States Court of Appeals,
Seventh Circuit.

Argued May 27, 1986.
Decided Aug. 18, 1986.

---

Nicholas A. DeJohn, Chicago, Ill., for defendant-appellant.

Steven A. Miller, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, and EASTERBROOK and RIPPLE, Circuit Judges.

EASTERBROOK, Circuit Judge.

A former Chicago police officer collected disability benefits while working full time. For more than two years he mailed monthly affidavits representing that he had not "resume[d] employment for compensation while in receipt of disability benefit". One who "resumes" employment (in the language of the affidavit) or "assumes" employment (in the language of the state statute, Ill.Rev.Stat. ch. 108½, § 5–157) has his disability benefits reduced one dollar for every dollar of earnings, once the combination of disability benefits and earnings exceeds the officer's former salary.

DeCastris had not exactly "assumed" or "resumed" employment, however. For five years before he left the police force, he had held a full-time job managing the nationwide trucking operation for Zenith Electronics Corp. The job with Zenith paid more than the job with the police. Holding two full-time jobs is forbidden by Zenith. Zenith learned of the police job in 1978 and demanded that DeCastris quit one or the other. DeCastris left the police job with disability benefits, which led to this case. The police did not learn of the Zenith job until DeCastris had collected benefits for 27 months, the maximum to which an officer with DeCastris's nine years of service is entitled. Had he disclosed that he was making more than $2,500 a month from Zenith (which he was in 1979), disability officials testified, he would not have received disability benefits.[1] The crime is mail fraud, in violation of 18 U.S.C. § 1341

---

1. When DeCastris left the police in March 1978 he was earning $19,236 a year ($1,603 a month), and his disability benefit was $763 a month. During 1978 DeCastris earned about $2,300 a month at Zenith. This income, $774 a month greater than his salary with the police, would have required the disability benefits to be eliminated. DeCastris's income at Zenith rose during 1979 and 1980, so disability benefits would have remained at zero had DeCastris disclosed his income.

(the affidavits went by mail); the sentence is two years' imprisonment, five years' probation, and a fine of $5,000.

DeCastris concedes that he was working full time at Zenith and that he did not reveal this employment to the officials administering the disability program.[2] He insists that this is not mail fraud because both the state statute and the monthly affidavit are ambiguous. He says that an ordinary person would think that "assume" employment means "take a new job" and that "resume" employment means "go back to your old job"—neither of which he did, because he worked at Zenith without interruption. This is not a claim that De-Castris complied with state law. The head of the disability board testified that he did not, and in the district court DeCastris argued insufficiency of the evidence rather than legal error. The prosecutor's argument is that DeCastris intentionally put the disability board off the scent, forestalling any resolution of ambiguities in the state's law. DeCastris's position is that state law and the affidavit were so opaque that De-Castris should not be held criminally liable for failing to alert the board to his employment.

 The crime of mail fraud is a fraudulent "scheme" facilitated by use of the mails. *United States v. Lindsey*, 736 F.2d 433, 436 (7th Cir.1984); *United States v. Feldman*, 711 F.2d 758, 765 (7th Cir.),

*cert. denied*, 464 U.S. 939, 104 S.Ct. 352, 78 L.Ed.2d 317 (1983). The mailings may be innocent or even legally necessary. *United States v. Green*, 786 F.2d 247 (7th Cir. 1986). Here the mailings facilitated the scheme, if there was a scheme. The question whether DeCastris practiced a scheme to extract benefits to which he was not entitled is one of fact, depending on the state of his knowledge. Concealing information known to be pertinent to a proper decision may be a fraudulent scheme. *Feldman; United States v. Bush*, 522 F.2d 641, 646 (7th Cir.1975); *United States v. Keane*, 522 F.2d 534, 544 (7th Cir.1975), *cert. denied*, 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed.2d 746 (1976). It is a crime to lie about your income to tax officials even if you might be able to show that you owe no tax; the parallel here is that it may be mail fraud to lie about your income to disability officials and forestall any inquiry into the effect of a second job. If DeCastris knew that he had to disclose his employment, that his earnings may have mattered no matter when he started working at Zenith, then there was a scheme to defraud, and if not, not.

The instructions presented this question squarely for the jury's decision. They told the jurors that in order to convict DeCastris they had to be convinced that he acted "knowingly and with the intent to defraud." Another instruction elaborated, stating that knowledge means that "the

2. Each affidavit is on a preprinted form that begins: "An Amendment to the Duty Disability and Ordinary Disability Section of the Police Pension Act passed at the 1961 session of the Illinois Legislature is to the effect that any disability beneficiary who shall resume employment for compensation while in receipt of disability benefit, when added to his compensation for such employment during the time of disability, would exceed his rate of salary which would be paid to him if he were working in his regularly appointed Civil Service position as a Policeman." This sentence fragment must be designed to induce the claimant to reveal details about employment on the ground that it has something—the fragment does not say just what—to do with his benefits. Another sentence says that the affidavit must be filed monthly. Then after the preprinted jurat the form continues:

I _____ being duly sworn on oath depose and say:

1. That I $\frac{was}{was\ not}$ employed during the month of _____ 19__.
2. The compensation for such position was in the amount of $_____.
3. That the name of my employer was _____.
4. That the address of my employer was _____.
5. Employment for any Governmental Agency is prohibited.

Subscribed and sworn before me this ___ day of _____ A.D.,19__

_____
NOTARY PUBLIC

DeCastris filled out his first affidavit by inserting his name, crossing out both "was's" in line 1, and inserting "April 1978" on that line. No other line is completed. He filled out the second month's affidavit by crossing out the "was" on top of line 1 and inserting "May 1978." The

acts charged were done knowingly and with the intent to mislead the Policeman's Annuity and Pension Board as to the defendant's employment at Zenith Electronics Corporation, in order to cause a financial gain to defendant. Good faith is a complete defense to the charge of mail fraud." DeCastris did not object to this instruction. The evidence, now taken in the light most favorable to the prosecution, supports an affirmative answer. DeCastris had received a letter from the disability officials stating: "in the event disability benefit payments and regular employment compensation exceed Civil Service salary, a reduction in payment of disability benefits shall be made the following month." This letter, coupled with the evident purport of an affidavit seeking information about employment, could lead a reasonable juror to conclude that DeCastris—a police officer, the supervisor of 90 employees at Zenith, and therefore aware of the nature of bureaucratic forms in general—knew that he had to reveal information about all earnings from employment. Cf. *Screws v. United States*, 325 U.S. 91, 101–07, 65 S.Ct. 1031, 1035–38, 89 L.Ed. 1495 (1945).

The prosecutor bolstered the inference by showing that DeCastris lied in response to clear questions as well as cloudy ones. The judge allowed the prosecutor to introduce ten documents containing lies. One was DeCastris's application for employment at Zenith, which claimed more education than DeCastris possessed and omitted information about his job as a police officer. DeCastris claimed to be self-employed. Most of the rest were annual questionnaires filed with the police claiming nonexistent educational credentials. The judge excluded from evidence another form in which DeCastris told the police department that he lived in Chicago (which is legally required of a Chicago police officer); DeCastris did not live in Chicago, and the judge thought this particular lie would

be unduly prejudicial. See Fed.R.Evid. 403.

■ DeCastris's counsel put his intent in issue by emphasizing the ambiguity of "assume" and "resume". (DeCastris did not testify, so we do not have his own account of his mental state.) Fed.R.Evid. 404(b) allows the introduction of "other wrong" evidence to show intent, although not to show the defendant's character. "Intent" and "character" may merge in a case such as this, however, making the application of the rule difficult. DeCastris says that the forms were used to portray him as a bad actor, likely to lie again in filling out the next form. No doubt there is something to this concern. Evidence of this type invites the inference that he who lies often ought to be damned as a liar without regard to the crime in question. On the other hand, a demonstration that DeCastris lied repeatedly in response to clear questions on other forms shows something about his intent in filling out the affidavits for the disability officials. Did he omit the information because of confusion or even a genuine belief that pre-existing jobs need not be revealed? Or did he omit the information in order to befuddle the officials and obtain benefits to which he knew he was not entitled? Evidence that DeCastris had sought to mislead through the use of other forms influences the proper understanding of his intent in filling out the affidavits.

The "bad character" inference is inseparable from the "bad intent" inference. We do not pretend that a jury can keep one inference in mind without thinking about the other. An instruction told the jury to do this,[3] but this is like telling someone not to think about a hippopotamus. To tell someone not to think about the beast is to assure at least a fleeting mental image. So it is here. Each juror must have had both the legitimate and the forbidden con-

---

next 24 affidavits were returned signed but otherwise unmarked. None of the 26 is notarized.

**3.** "You have heard evidence of acts of the defendant other than those charged in the indictment relating to employment and a credit appli-

cation. You may consider this evidence only on the question of intent. The evidence is to be considered by you only for this limited purpose. It would be improper for the jury to consider this evidence for any other purpose."

siderations somewhere in mind, if only in the subconscious.

■ Yet this unwelcome consequence of using "other wrong" evidence does not make the evidence inadmissible. It is relevant to the outcome of the case. The risks of error are not one-sided. A jury forced to assess DeCastris's claim of mistaken interpretation without being able to examine his history of filling out forms may have been led to error. The prosecutor could not stop with a single incorrect form. That, too, may have been chalked up to error or mistake. The relevant evidence is the *pattern* of lies in response to questions on forms. It is the pattern, and not an isolated episode, that helps the jury to assess DeCastris's intent in returning the affidavits month upon month. See also, e.g., *United States v. Ramsey*, 785 F.2d 184, 191–92 (7th Cir.1986) (sustaining the use of evidence of lies about educational achievement as part of proof of intent); *United States v. Chaimson*, 760 F.2d 798, 805 (7th Cir.1985); *United States v. Miller*, 573 F.2d 388, 393 (7th Cir.1978). Naturally the pattern will span a course of years (otherwise it's not much of a pattern), so the fact that the forms introduced here go as much as ten years before the first affidavit does not count against them. Cf. *United States v. Lea*, 618 F.2d 426, 431 (7th Cir.), *cert. denied*, 449 U.S. 823, 101 S.Ct. 82, 66 L.Ed.2d 25 (1980) (similar acts 10 or 12 years before the events charged); Fed.R.Evid. 609(b) (presumptive limit of ten years on age of prior convictions used to impeach a witness).

When the "other wrong" evidence is relevant to a legitimate subject such as intent, the district judge must decide how much is too much. *United States v. Kane*, 726 F.2d 344, 348 (7th Cir.1984); *United States v. Wormick*, 709 F.2d 454, 459 (7th Cir. 1983). This delicate balance of probative force against undue prejudice calls for all of the judge's skills. The judge must enter the mind of the jurors and appreciate how a piece of evidence fits. How the evidence fills out the picture drawn at trial, how well the jurors can suppress their natural incli-

nations to use the information for forbidden as well as legitimate purposes, and even more factors require an assessment of imponderables. In this case there are no clear answers, and reasonable judges could come to different conclusions. When there is no clear right and wrong, we review the decision under a deferential standard. See *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 831 (7th Cir.1985); *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985); *Ramsey, supra.*

The evidence of prior lies had great potential to produce condemnation of character, which could lead to an emotional rather than reasoned conviction, but this potential was not so powerful (in relation to the legitimate value of the lies) that the district judge's decision is beyond the pale. The judge approached the job thoughtfully, and she eliminated evidence of a lie about residence to which she thought jurors would react improperly. The line must be drawn somewhere, and when the line is drawn with care, as it was here, an appellate court may not substitute its judgment for that of the district judge. Cf. *Maine v. Taylor*, —— U.S. ——, ——, 106 S.Ct. 2440, 2450–51, 91 L.Ed.2d 110 (1986); *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511–13, 84 L.Ed.2d 518 (1985). The district judges, specialists in applying rules to facts, generally have the last word in drawing lines where surveyors do not go. The line drawn in this case was tenable.

AFFIRMED.

RIPPLE, Circuit Judge, dissenting.

The federal mail fraud statute is a difficult one to administer judicially. The fraud it is designed to prohibit is often subtle and difficult to detect. Consequently, proving an allegation in a judicial proceeding is no easy task. On the other hand, it is also difficult to defend against allegations brought under this statute. In most cases, through careful scrutiny of the evidence submitted to support each element of the offense and through careful weighing of evidentiary submissions which have the potential to mislead or inflame the jury, the

trial judge ensures a just result. In this case, neither of these functions was adequately performed. The result is injustice to this defendant and the creation of a precedent which someday may provide encouragement for further abuse of the mail fraud statute.

## I

The government's theory of this prosecution was that Mr. DeCastris had a duty under section 5–157 of the Illinois Policeman's Annuity and Benefit Fund Act to report the income which he earned from his employment with Zenith Electronics Corporation.[1] It further alleged that he knowingly breached that duty by filing with the Fund affidavits which failed to disclose that income. Neither proposition is established in the record.

First, although the district judge held that, as a matter of law, the statute required the disclosure of the Zenith employment,[2] the statutory language hardly supports that reading. The statute requires a reduction of payments for those individuals who earned income from jobs which they *assumed* during the disability period (or *resumed*, to use the exact language of the affidavits which the Disability Board sent to potential recipients). As the majority correctly recognizes, "DeCastris had not exactly 'assumed' or 'resumed' employment." *Supra* at 262. Rather, his "second job" employment with Zenith Electronics Corporation had begun quite a while

*before* he took disability leave from the police force. Therefore, since Mr. DeCastris already held a job when he became disabled, he neither assumed nor resumed employment during the disability period. He simply continued employment he had already undertaken. Accordingly, by not disclosing the income from his Zenith job, he did not breach the duty imposed by section 5–157 and, consequently, did not commit the underlying fraud charged in this indictment. In essence, the Policeman's Annuity and Benefit Fund specifically asked Mr. DeCastris to report all of the income which he had earned from jobs that he either *assumed* or *resumed* during the disability period. He reported no such income. That statement was the truth. Consequently, he cannot be guilty of knowingly making misstatements to the Fund.

Furthermore, even if the statute had placed such an obligation upon him, there is no real evidence that he should—or could—have understood such an obligation and, therefore, could have intended to violate it. As the Fourth Circuit stated in *United States v. Mallas*, 762 F.2d 361 (4th Cir.1985), "[i]t is settled that where [sic] the law is vague or highly debatable, a defendant—actually or imputedly—lacks the requisite intent to violate it." *Id.* at 363 (quoting *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir.1974)).[3] The obligation suggested by the government is certainly not apparent from the statute's plain wording. As the government admitted at

---

1. While it is true that, for a conviction under mail fraud, the underlying scheme to defraud need not be coexistent with a violation of either state or federal law, it is also true that when the indictment premises the fraud on a violation of state law—and, more importantly, when the state statute alone creates a duty on the part of the appellant to report his income—failure on the government's part to prove that the statute was violated is fatal to the government's case.

2. Oct. 1 Transcript at 13–14. It is difficult to understand why the district judge would have made such a ruling if, as the majority contends, it was not necessary to the prosecution's case. Apparently, the district judge also understood that the fraud alleged in the indictment was premised on a violation of the state statute.

3. The Supreme Court of the United States "has recognized that the requirement of a specific intent to do a prohibited act may avoid those consequences to the accused which may otherwise render a vague or indefinite statute invalid." *Screws v. United States*, 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945). However, "in order to cure an otherwise vague statute, the scienter requirement must ' "envisage not only a knowing what is done but a knowing that what is done is unlawful, or at least, so 'wrong' that it is probably unlawful." ' ... A scienter requirement cannot eliminate vagueness, therefore, if it is satisfied by an 'intent' to do something that is in itself ambiguous." *Nova Records, Inc. v. Sendak*, 706 F.2d 782, 789 (7th Cir.1983) (citation omitted).

oral argument, it knows of absolutely no decision or opinion—either judicial or administrative—which interpreted section 5–157 prior to the trial in this case. This federal *criminal* action is the first attempt to define the contours of an extremely vague state statute. Moreover, there is nothing in the record of this case which would have put Mr. DeCastris on notice that he was failing to comply with the law. Mr. DeCastris, like an increasingly large number of people today, held two jobs at the same time. The government offered no evidence to indicate that the police department prohibited that type of "moonlighting." [4] Mr. DeCastris' disability payments were the consequence of an actual injury and replaced that portion of his total income formerly attributable to his police salary. It would have been quite understandable for Mr. DeCastris to interpret the Fund's communication and affidavits as expressing a concern as to whether he had taken on civilian work to replace his police income. Indeed, the record indicates that Mr. DeCastris' income, including the disability payments, was actually less than if he were still working both jobs.

## II

One may fairly wonder, then, how Mr. DeCastris was convicted. The answer can be found in the trial court's wholesale admission into evidence of almost a dozen documents in which Mr. DeCastris had allegedly lied about other matters.[5] Most of these documents contained misstatements about his educational background. These documents did more than—as the majority puts it—"bolster" the government's case. They were, as a practical matter, the government's entire case. Through the admission of this material, the government was able to expand the trial into a general review of the defendant's moral life and to convey to the jury a single, potent message: the defendant was a very bad man who should be punished because he had been "getting away with things" for a long time. This litigation tactic is explicitly forbidden by Fed.R.Evid. 404.

The majority asserts that this evidence is tightly intertwined with evidence of Mr. DeCastris' intent to defraud. Thus, according to the majority's analysis, if the appellant's intent was put in issue in this case, the evidence must be admissible. The majority then concludes that "DeCastris's counsel put his intent in issue by emphasizing the ambiguity of 'assume' and 'resume.' * * * The relevant evidence is the *pattern* of lies in response to questions on forms." *Supra* at 264, 265 (emphasis in original). This argument must fail. Whatever relevance the evidence might have had on the issue of intent to defraud was drastically outweighed by the possibility of prejudice. Given the absence of any other evidence tending to show that Mr. DeCastris intended to defraud the Fund by his statements, the admission of this evidence could only have confused the jury with respect to the actual issue before it. Some of the alleged misstatements had occurred in substantially different time frames and involved substantially different matters. Moreover, the trial judge showed little selectivity in determining what information to admit and what to exclude.[6]

## Conclusion

In this case, the government had to prove a very precise allegation. Although

---

**4.** Assuming, *arguendo,* the correctness of the majority's characterization of the prosecution, this factor is, of course, still crucial. If Mr. DeCastris were permitted to have a second job while a police officer, it was quite reasonable for him to determine that his disability income was to replace his police income, not his entire income.

**5.** The admission of this material would also have been erroneous under the majority's characterization of the prosecution since this evidence was admitted on the question of intent.

**6.** The one excluded submission dealt with a misstatement with respect to residency. The district judge believed that "[p]eople do feel quite strongly about that residential requirement...." Sept. 27 Transcript at 36–37. At a later hearing, the trial judge further explained that the submission was excluded "because of my own strong feelings about local firemen and policemen who don't live in the city and tell the city yes, they do live in the city." Sept. 30, 10:15 a.m. Transcript at 5.

it specifically charged the defendant with breaching a duty imposed by a specific state statute, it failed to prove that he had such a duty or, if he had such a duty, that he knew or could have known of it. Instead, it simply established that, in his lifetime, he had done other things which were dishonest. This is hardly, under the rule of law, a basis for a federal mail fraud conviction. Accordingly, I respectfully dissent.